## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN - SOUTHERN DIVISION

KATRINA LOVE-MCKINLEY,                        Case No. 1:14-cv-00840-RHB
as Personal Representative of the
ESTATE OF DAHNONTAE R. MCKINLEY,              Honorable Robert Holmes Bell

       Plaintiff,

v.

COUNTY OF MUSKEGON, et al.,

       Defendants.
_____/

Stephen R. Drew (P24323)                  Douglas M. Hughes (P30958)
Adam C. Sturdivant (P72285)               Horia Razvan Neagos (P73550)
DREW, COOPER & ANDING                     WILLIAMS HUGHES, PLLC
Attorneys for Plaintiff                   Attorneys for Defendants
80 Ottawa Avenue NW, Suite 200            120 W. Apple Ave.
Grand Rapids, Michigan 49503              P.O. Box 599
Phone: (616) 454-8300                     Muskegon, MI 49443-0559
E-mail: sdrew@dca-lawyers.com             Phone: (231) 726-4857
E-mail: asturdivant@dca-lawyers.com       E-mail: doughughes@williamshugheslaw.com
                                          E-mail: hrn@williamshugheslaw.com

                                          Allan C. Vander Laan (P33893)
                                          Andrew James Brege (P71474)
                                          CUMMINGS, MCCLOREY, DAVIS & ACHO
                                          2851 Charlevoix Drive SE, Suite 327
                                          Grand Rapids, Michigan 49546
                                          Attorneys for Defendants
                                          Phone: (616) 975-7470
                                          E-mail: avanderlaan@cmda-law.com
                                          E-mail: abrege@cmda-law.com
_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT COUNTY OF MUSKEGON'S
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INDEX OF AUTHORITIES.........................................................................................ii - iii

   I.  INTRODUCTION ...........................................................................................1

   II.  COUNTER STATEMENT OF FACTS  .........................................................1

   III. SUMMARY JUDGMENT STANDARD......................................................... 2-3

   IV. LEGAL ANALYSIS AND ARGUMENT ...................................................... 2-25

      A.  Individual Supervisor Liability under Section 1983 .................................. 2-4

         1.  Defendant Theresa Jones-Burton is liable in her individual
            supervisory capacity....................................................................... 2-3

         2.  Defendant Roesler is liable in his individual supervisory capacity .................... 3-4

      B.  There are genuine issues of material facts as to whether Defendant's
         Polices are unconstitutional under *Monell v. Dept. of Soc. Serv.*  ......................... 4-25

         1.  Lack of Policy + Deficient Policies = Unconstitutional Policy ........................ 6-11

         2.  Defendant's Deficient O/C Spray Policy was Not Followed........................... 11-14

      C.  Defendant Muskegon County is liable under Section 1983 for its failure
         to provide adequate training in light of predictable and foreseeable
         consequences that could result from a lack of training.......................................... 14-25

   V.  RELIEF REQUESTED....................................................................................25

INDEX OF EXHIBITS...........................................................................................26

CERTIFICATE OF SERVICE ...............................................................................27

## <u>INDEX OF AUTHORITIES</u>

### <u>Cases</u>

*Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,*

    130 F. Supp. 2d 928 (S.D. Ohio 1999) ..............................................................1

*Allen v. Muskogee,* 119 F.3d 837 (10th Cir. 1997)..................................................24, 25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................1, 2

*Campbell v. City of Springboro, Ohio,* 700 F.3d 779 (6th Cir. 2012) .........................3, 4

*Carey v. Helton,* 70 F. App'x 291 (6th Cir. 2003) .......................................................5, 6

*City of Canton v. Harris,* 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)......5, 6, 14, 15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...............................................................1

*Doe v. Claiborne Cnty.*, 103 F.3d 495 (6th Cir. 1996) ................................................5, 6

*First National Bank v. Cities Service Co.,* 391 U.S. 253,

    88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968) ..........................................................2

*Graham v County of Washtenaw*, 358 F.3d 377 (6th Cir. 2004) ....................................9

*Heyerman v. County of Calhoun*, 680 F.3d 642 (6th Cir. 2012)....................................2

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).................5

*Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464,

    82 S. Ct. 486, 7 L. Ed. 2d 458 (1962) ...............................................................2

*Tithof v. Reed,* 2015 U.S. Dist. LEXIS 45573 (E.D. Mich. Apr. 8, 2015) ...........6, 7, 10

*Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005) ......................................5

*Thomas v. Cumberland County,* 749 F.3d 217 (3rd Cir. 2014) ....................................15

*Walker v. Norris*, 917 F.2d 1449 (6th Cir. 1990).........................................................22

*Wiley v. U.S.,* 20 F.3d 222 (6th Cir. 1994)................................................................1, 2

## <u>INDEX OF AUTHORITIES (cont'd)</u>

*Williams v. Belknap*, 154 F. Supp. 2d 1069 (6th Cir. 1987) .............................................................1

## <u>Federal Rules and Statutes</u>

FED. R. CIV. P. 56(c) ...............................................................................................................1

42 U.S.C. §1983 ...................................................................................................... *passim*

## I.      INTRODUCTION

Plaintiff Katrina Love-McKinley, Personal Representative of the Estate of Dahnontae McKinley, opposes Defendant County of Muskegon's Motion for Summary Judgment and respectfully requests this Court **DENY** the Motion in its entirety.

## II.     COUNTER STATEMENT OF FACTS

Plaintiff incorporates and relies on the facts as set forth in Plaintiff's Motion for Summary Judgment,[1] and Plaintiff's Response to Defendant's Motion for Summary Judgment filed contemporaneously with this brief.[2]

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment should not be granted if there are genuine issues of material fact disputed.[3] The moving party must prove no genuine issues of material fact exist.[4] At the summary judgment stage, the Court's function is not to weigh evidence or determine the truth of any particular matter.[5] Ultimately, the Court is not required or permitted "to judge the evidence or make findings of fact,"[6] as the purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried."[7] In this case, there are several genuine issues of fact to be tried and Defendants' motions for Summary Judgment should be denied.

The fact that the weight of the evidence favors the moving party does not authorize a court

---

[1] ECF 48, PageID .

[2] ECF #___, forthcoming

[3] FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

[4] *Celotex Corp.*, 477 U.S. at 322.

[5] *Wiley v. U.S.*, 20 F.3d 222, 226 (6th Cir. 1994) *quoting Anderson,* 477 U.S. at 249.

[6] *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (6th Cir. 1987).

[7] *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).

to grant summary judgment.[8] "The issue of material fact required by Rule 56(c) … to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial."[9] At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter.[10]

## IV.   LEGAL ANALYSIS AND ARGUMENT

### A.  Individual Supervisor Liability under §1983

"Section 1983 liability. . .cannot be premised solely on a theory of respondeat superior, or the right to control employees. . . Supervisory officials are not liable in their individual capacities unless they 'either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."[11]

### 1.  Defendant Theresa Jones-Burton is liable in her individual supervisory capacity

Defendant Theresa Jones-Burton's individual actions violated McKinley's constitutional rights. She was the shift commander and supervisor on December 22, 2012, but was also personally and intimately involved in the unconstitutional use of restraint devices which caused McKinley's death. Her actions were not merely negligent, nor were her actions solely grounded in a right to

---

[8] *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 472, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962).

[9] *First National Bank v. Cities Service Co.,* 391 U.S. 253, 288-89, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968).

[10] *Wiley v. U.S.,* 20 F.3d 222, 226 (6th Cir. 1994) *quoting Anderson,* 477 U.S. at 249.

[11] *Heyerman v. County of Calhoun*, 680 F.3d 642, 647-49 (6th Cir. 2012).

control employees. She acted with purpose and with deliberate indifference. She was in the fray; her boots were on the ground. She had responded to the call and was actually inside the cell with McKinley and the other deputies.[12] She not only failed to competently supervise the deputies, but also during the restraint of McKinley, physically retrieved pepper-spray from the booking office and handed it to Defendant Smith.[13] Her personal involvement was pivotal as she was aware of decontamination solution in the command office[14] -- her office -- yet failed to retrieve it or instruct others to retrieve it to decontaminate McKinley. Defendant Jones-Burton had the authority to stop the escalating use of force and to order McKinley be decontaminated pursuant to policy.

Additionally, once McKinley had been pepper sprayed, handcuffed behind his back, and shackled, Defendant Jones-Burton was the person who went to retrieve the restraint chair.[15] She grabbed it from the hallway and pushed it back around to the door opening.[16]

### 2.   Defendant Roesler is liable in his individual capacity

Actions and omissions of Defendant Roesler were the moving force and cause of McKinley's death. Defendant Roesler's liability is akin to that found in *Campbell v. City of Springboro, Ohio,*[17] in which the district court determined the disputed facts precluded summary judgment. In *Campbell,* although the chief was not actively involved in the incidents involving the canine unit, a causal connection between his acts and omissions and the alleged constitutional injuries was suggested by the record. The Chief allowed work in the field even after training had lapsed; he did not require appropriate supervision of the canine unit; and, he failed to publish an

---

[12] ECF 48-27, PageID 1257 (dep. p. 103, lns. 18-22).
[13] *Id.* at PageIDs 1257, 1258 (dep. p. 102, ln. 24 – p. 103, ln. 4, p. 107, lns. 13-14). *See also,* ECF 48-6, PageID 964-965 (Jones-Burton Supplemental Report).
[14] ECF 48-27, PageID 1261 (dep. p. 118, lns. 4 – 14).
[15] *Id*. at PageID 1259 (dep. p. 111, ln. 24 – p. 112, ln. 4).
[16] *Id*. at PageID 1260 (dep. p. 113, lns. 3-6).
[17] *Campbell v. City of Springboro, Ohio,* 700 F.3d 779, 790 (6th Cir. 2012).

official K-9 unit policy. The Court concluded the Chief's apparent indifference to maintain a properly functioning K-9 unit could be reasonably expected to give rise to the injuries that occurred.

Similarly, in the present matter Defendant Roesler allowed deputies to continue working in the jail facility using restraint devices despite knowing (through records and otherwise) specific training had not occurred. Similar to the lack of a canine policy in *Campbell*, Defendant Roesler did not publish an official policy regarding restraint chairs, spits hoods, and the combined use of these devices with pepper-spray. As explored in this brief, the County's restraint policy is generic and was ineffective. It states in part, "restraints will not be used in a manner that would result in injury to or as punishment for an inmate."[18] The recurrent use of restraint devices in the jail environment demands specific and instructive policy.

Defendant Stout indicated the Sheriff (*i.e.,* Defendant Roesler) is the final decision maker for all of Muskegon County's policy and practice.[19] Defendant Roesler confirmed his status as the final decision maker for policies, practices, procedures, and training.[20] As final decision maker Defendant Roesler should have revised Defendant Muskegon County's policies and demanded training on the use of a spit hood and the restraint chair, but he did not. He should have commanded the deputies not to use pepper spray and a spit hood simultaneously, but he did not. He should have commanded the deputies to decontaminate inmates who'd been pepper sprayed immediately, or within a few minutes of being sprayed instead of leaving the discretionary "as soon as practical" instruction in the pepper spray policy, but he did not. For all of the above reasons, there are disputed facts as to Defendant Roesler's individual liability.

---

[18] ECF 48-15, PageID 1107 ("Physical Force, Restraints, p. 116).
[19] ECF 48-24, Stout Dep. Trans, p. 20, lns. 2-12.
[20] ECF 48-25, Roesler Dep. Trans, p. 6, lns. 6-11.

**B. There are genuine issues of material fact as to whether Defendant's policies are unconstitutional under *Monell v. Dept. of Soc. Serv.*[21]**

Plaintiff's rights were violated not only as a result of deficient written policy but also the complete lack of policy and training in critical areas. *Monell* imposes municipal liability under §1983 when (1) a constitutional violation has occurred and (2) the municipality "is responsible for that violation,"[22] based on the execution of a government policy or custom.[23] To hold Defendant Muskegon County liable under §1983, Plaintiff "must show that the municipality's policy, **or lack thereof**, was a 'moving force' in the deprivation of [McKinley's] rights and arose from 'deliberate indifference' to [his] rights."[24]

A plaintiff has at least four avenues available to prove the existence of a municipality's illegal policy or custom: (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.[25] There are questions of fact as to not one, but all four avenues leading to municipal liability. As to these theories, Plaintiff incorporates and relies upon the arguments set forth in Plaintiff's Brief in Support of her Motion for Summary Judgment previously filed and thus will not be restated here.[26] Each theory relates to Defendant's unconstitutional policies and lack of policies, and practices and customs promulgated and permitted by Defendants Roesler and Stout, and carried out by

---

[21] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

[22] *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505 (6th Cir. 1996).

[23] *See, Monell*, 436 U.S. at 694.

[24] *Carey v. Helton*, 70 F. App'x 291, 293 (6th Cir. 2003) *citing Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 508 (1996); *see also City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)(holding "the inadequacy of police training may serve as the basis for §1983 liability," but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.").

[25] *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

[26] ECF 48.

Defendant Jones-Burton in their official capacities.

In viewing the inadequacies of the County's general policies, and lack of specific policies regarding the foreseeable and predictable dangerous use of spit hoods and restraint chairs, and the combination of those restraint procedures with pepper spray, in a light most favorable to Plaintiff, there is sufficient evidence for reasonable minds to find a direct casual link between Defendant's "policies" and the deprivation of McKinley's rights.

### 1.   Lack of Policy + Deficient Policies = Unconstitutional Policy

Defendant Jones-Burton and the deputies' testimony confirms Defendant Muskegon County has <u>no</u> written policies regarding the use of spit hoods or restraint chairs, either alone, or in conjunction with one another.[27] Defendant Roesler also confirmed the lack of written policies regarding the use of a spit hood, the use of a restraint chair, or the combined use of pepper spray, restraint chair, and spit hood.[28] Further, the written policies Defendant Muskegon County had on pepper spray, physical force, and restraints generally fall woefully short.[29]

To hold a municipality liable under §1983, a plaintiff "must show that the municipality's policy (or lack thereof) was a 'moving force' in the deprivation of [his] rights and arose from 'deliberate indifference' to [his] rights."[30] In *Tithof v. Reed,*[31] the City did not have specific policies

---

[27] ECF 48- 27, PageID 1242, (Jones-Burton Dep. Trans, p. 41, ln. 3 – p. 42, ln. 9, p. 116, lns. 19-22); ECF 48- 11, PageID 1051 (Smith Dep. Trans., Vol. I, p. 113, ln. 25); ECF 48-12, PageID 1059 (Topp Dep. Trans., Vol. I, p. 105, ln. 2).

[28] ECF 48-25, PageID 1224-1225 (Roesler Dep. Trans, p. 83, lns. 16 – 22, p. 84, lns. 1 -2).

[29] ECF 48-3, PageID 908 (Expert Peters Dep. Trans, p. 109, lns. 18 – p. 110, ln. 2)(Muskegon County policy on restraints is insufficient regarding the restraint chair as the policy does not explain how to use the chair); PageID 909 (p. 116, ln. 9 – p. 117, ln. 7)(medical assistance should have been called when McKinley was placed in restraint chair as is common practice across the U.S.); PageID 922 (p. 167, lns. 7-15)(inconsistencies between pepper spray and restraint policies).

[30] *Carey v. Helton*, 70 F. App'x 291, 293 (6th Cir. 2003) *citing Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 508 (1996); *see also City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).

[31] Exhibit A, *Tithof v. Reed*, 2015 U.S. Dist. LEXIS 45573 (E.D. Mich. Apr. 8, 2015).

governing the use of handcuffs, but it did have policies concerning use of force. The plaintiff's police expert opined the City's lack of a policy instructing officers to properly handcuff arrestees behind the back unless injury, medical condition, deformity, or extenuating circumstances exist was the moving force behind the violation. Unlike the present case, the officers in *Tithof* testified they had all been trained in the use of handcuffs in their respective police academies. The officers also testified they were aware handcuffs can produce injuries and were trained to make sure handcuffs were not too tight and were trained to use a finger" check to do so. Thus, the Court ultimately ruled the plaintiff did not present sufficient evidence to suggest the city was deliberately indifferent to the need for a handcuffing policy, or more specifically a policy addressing the use of handcuffs on injured arrestees. The facts of this case are distinguishable from *Tithof*, as detailed below, as genuine issues of material fact exist as to the existence and adequacy of deputy training with respect to spit hoods and restraint chairs.

Generalized policies are not sufficient for restraint devices that are expected to be used in the field (*e.g.* restraint chairs and spit hoods). Defendant argues its policy is constitutional because they have a written restraint policy and their officers are given on-the-job training on how to use the restraint chair and spit hood.[32] These material issues are rife with questions of fact as identified below. Muskegon County had in place defective physical force and restraint policies and practices when viewed in light of the use of restraint chairs and spit hoods. The non-specific policy granted unfettered discretion to deputies to use excessive force, and expressly permitted the use of force on resistors, and on individuals who have merely defended themselves against excessive force.

Defendant cannot hide behind its generalized physical force and restraint policy for shelter in this case. The Muskegon County Jail restraint policy is insufficient with respects to use of the

---

[32] ECF 45-1, PageID 217, (p. 20).

restraint chair because it doesn't tell you how to use a restraint chair,[33] when to put people in the chair, when to check on them, or when not to check on them.[34] It does not indicate when you should and should not use a spit hood. Guidelines for the use of restraint chairs is widespread in correctional facilities, from Maricopa County Jail, to Georgia, to Singapore correctional services.[35] Specific policies for equipment regularly used is not a novel idea, and is required to prevent the violation of pretrial detainee rights.

Among other deficiencies, Dr. Peters found Defendant Muskegon's policy on restraints to be insufficient, especially concerning use of a restraint chair. The policy states an inmate in restraints is not to be left "without supervision" and Dr. Peters opined the meaning signified the inmate should be accompanied by a deputy (or other officer), and that it was insufficient for a deputy to observe the inmate from a distance in order to comply with the policy.[36] Thus, the facts of this case show Defendant's general policies were not only inept, but were not followed.

Defendant's Physical Force and Restraint policy are fully contained within 1 page of written text.[37] Notably, a spit hood is not mentioned, so it is unclear which policy (if any) is instructive on the proper use of spit hoods. Similarly, the restraint chair is not mentioned. Defendant admits its policies do not specifically include instruction on the use of the restraint chair or the spit hood.[38] At a minimum, consistent with the O/C Spray and decontamination policy which spans 3 ½ pages alone, separate restraint chair and spit hood policies should include sections on authorized use, regulations on use, treatment following use, and reporting of the use.[39] With respect

---

[33] ECF 48-3, PageID 908, (Peters dep p. 109, ln. 18 - p. 110, ln. 2).
[34] *Id*. at PageID 912 (dep. p. 125, lns. 1-13).
[35] *Id*. at PageID 909-910 (dep. p. 116, ln. 18 – p. 117, ln. 7).
[36] *Id*. at PageID 909, 922 (dep. p. 115, lns. 8-20, p. 167, lns. 2-18).
[37] *See*, ECF 45-15 and 45-26.
[38] ECF 45-1, PageID 212, (p.15).
[39] *See*, ECF 45-15.

to spit hoods for example, the sufficiency of generalized training at a police academy should be weighed by identifying which spit device was used in the training because spit veils and spit masks are structurally different,[40] and may require different training to safely and effectively use. As another example, a written taser policy may state the taser is prohibited unless a person is actively aggressive toward the officer rather than simple resisting arrest or failing to comply.

Defendant's reliance on *Graham v. County of Washtenaw[41]* is distinguishable from this case. In *Graham*, the essence of the municipal liability claim was that the County's contract with a third-party healthcare provider constituted a municipal policy that led to a deprivation of Mr. Graham's constitutional right to adequate medical care while in police custody.  Graham argued the County's policy did not adequately address his specific medical needs.

This is not Plaintiff's argument in this case. Defendant's policy is silent as to restraint chairs and spit hoods. Unlike *Graham*, there is no "contract/policy" insulating an inmate from reckless use of spit hoods and restraint chairs. Plaintiff's argument focuses on the deficiency of Defendant's existing policy and the nonexistence of policy on restraint chairs and spit hoods, given the regular use of these devices and the predictable and foreseeable consequences absent competent training. When Defendant challenged Plaintiff's expert on whether in practice separate policies actually exist specifically for spit masks, as opposed to a general restraint policy, the answer was a definitive "yes."[42]

The County was deliberately indifferent to the need for specific policies and training on spit hoods and restraint chairs given the inherent danger associated with their use. By their own

---

[40] ECF 48-3, PageID 902 (Peters dep. p. 87, lns. 1-13).
[41] *Graham v County of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004).
[42] ECF 48-3, PageID 904 (dep. p. 94, lns. 18-24).

admission, these procedures have been used many times before.[43] Disconcerting however is the lack of documentation regarding the use of force in these scenarios. Plaintiff specifically requested in discovery all documentation related to the use of force.[44] In return, Plaintiff received a few incident reports regarding restraints and pepper spray.[45] Something does not add up.

Defendants had knowledge that restraint chairs and spit hoods were being used often but had no policies regarding usage, and as demonstrated later in this briefing had no significant training on their use. Defendant argues that no one consults a manual on how to use a restraint chair. But that's only part of the issue and a very near-sighted and narrow scope of the problem. Without policy, without true training and instruction, there are no guidelines on how tight is too tight for using the restraint straps (as with the handcuff "finger" test in *Tithof*[46]); there is no guidance on how long to leave someone in the chair; there is no directive with respect to responding to someone whose airway is obstructed or compromised due to pepper spray and a spit hood.

By contrast, if specific policies are not needed for the restraint chair and spit hood, why have an independent policy on O/C Spray? Presumably the policy exists because despite some deputies testimony that O/C Spray is benign in the field, it can be deadly if mishandled and abused. The same can be said for the use of restraint chairs, spit hoods, and pepper spray especially when you intentionally fail to decontaminate a person.

Lastly, Defendant argues Plaintiff's concerns about the deficiencies of the policies are unfounded as the officers were given "on-the-job" training where they were shown how to use spit

---

[43] ECF 48-22, PageID 1209-1210, (Herman dep. p. 66 – 67); ECF 48-13, PageID 1074 (Drabczyk, dep. p. p. 71, ln. 3-6).
[44] Exhibit H, Excerpt, Plaintiff's Request for Production of Documents, Request. #28.
[45] ECF 48-23.
[46] *See,* Exhibit A, *Tithof v. Reed,* 2015 U.S. Dist. LEXIS 45573 (E.D. Mich. Apr. 8, 2015).

hoods and restraint chairs. As detailed in Section C, there is little question that genuine issues of material fact exist with respect to whether "on-the-job" training was actually received and whether it was remotely adequate under the circumstances.

### 2.  Defendant's Deficient O/C Spray Policy Was not Followed

The manufacturer of Defendant's O/C spray recommends the following steps, none of which were followed by Muskegon County Jail deputies, on December 22, 2012.

<u>Once the subject has been physically restrained</u> …

- Remove them from contaminated area **(this was not done)**
- Assess potential medical concerns **(this was not done)**
  …
- Remove any contaminated clothing (if appropriate) and seal in plastic bag **(this was not done)**
- Soak cloth in cool, clean water and use to wipe subject's skin – but don't rub the eyes **(this was not done)**
- Flush eyes and skin with cool, clean water … [47] **(this was not done)**

<u>Subject decontamination reminders</u>

- Closely monitor subject **(this was not done)**
- Subject should begin to feel relief within 20-30 minutes **(unknown, but highly unlikely as McKinley was dying)**
- Assess potential medical concerns … **(this was not done even though medical personnel was present and working less than one minute from the cell)**

<u>Area decontamination procedures</u>

- Open all windows and entrances possible for maximum ventilation. Fans help as well **(this was not done; the cell door remained closed)**
  …
- Wash hard surfaces with soap and water **(this was not done)**
- As circumstances allow, restrict access to the area until decontamination is observed.[48]

The County does have a pepper spray policy. Defendant's Oleoresin Capsicum (Pepper

---

[47] *See*, ECF 48-22, Sabre Pepper Spray Decontamination (comments added for emphasis).
[48] *Id.*

Gas) policy requires a deputy who uses O/C spray to:

> Remove the subject from the spray area and tell the subject to blow his/her nose to remove lodged particles. Areas of the body exposed to the liquid will be flushed with cold water as soon as practical following the use of the chemical.[49]

The deputies did not follow the manufacturer's instructions or their written policy.

Defendant relies on a portion of their policy requiring decontamination of an individual when practicable. The argument is counterintuitive. Even someone who has trained correction officers on the use of pepper-spray indicates that a person who has already been restrained (such as McKinley) makes decontamination easier, not more difficult.[50] McKinley couldn't move; he couldn't fight; and the evidence shows he was not spitting. He was not a threat after being pepper sprayed, shackled, restrained in a chair and handcuffed behind his back, positioned facing a wall, and a spit hood placed over his head.

Plaintiff has provided ample evidence in its Motion for Summary Judgment and Response to Defendant's Motion for Summary Judgment[51] addressing the inconsistencies in testimony regarding who was observing McKinley and to what extent, and the alleged threat McKinley posed to the deputies. Most notably, many deputies testified McKinley was not spitting at anyone. And with respect to what was practical, it would have been practicable to have medical personnel monitor McKinley; it would have been practicable to consider that his continued alleged "flailing" in the chair may have been an instinctual reaction to the pepper spray and a physical manifestation that he was in distress. With a hood over his head, no one determined the nature and extent of his condition. Not only does Defendant's O/C Spray policy fall short, it was clearly not followed in this case. Furthermore, Defendant's O/C spray policy is devoid of any instruction or guidance on

---

[49] ECF 48-20.
[50] ECF 48-3, PageID 907 (dep. p. 106, lns9-21).
[51] ECF # _____, forthcoming.

whether pepper spray should be used in conjunction with a spit hood, restraint chair, or any other restraint procedure.[52]

Defendant also relies on the argument that they could not decontaminate him before he "calmed down." Well…as it were…"calming down" for McKinley was in effect the process of dying. When he "calmed down" he was dead. Decontaminate inmates after you spray them with O/C spray. It's a straightforward directive. Doing so could save someone's life. Tending to their own safety and health, knowing the dangers of pepper spray, Defendants Smith and Drabczyk retired to the locker room in the basement to decontaminate.[53] Defendant Roberson also washed his face.[54] Defendant Topp went to medical to get cleaned up.[55] They carried out a decontamination process for themselves, while leaving McKinley alone to suffocate. Instead of decontaminating and appropriately supervising McKinley's deteriorating medical condition,[56] while he was fighting for his life, at least two deputies were congratulating each other.[57]

This is the bottom line: If you can't institute a policy which allows a way to safely decontaminate someone who is agitated presumably because they have been sprayed, or worse, can't breathe, then don't use pepper spray. And certainly don't use pepper spray *and* a spit hood, bind them to a chair, and leave the area unattended. At least if the deputies would have "water boarded"[58] McKinley (an extremely tasteless characterization suggested in Defendant's Motion

---

[52] *Id.*

[53] ECF 48-11, PageID 1047-1048 (Dep. Trans. DF Smith, Vol. 1, p. 98, ln. 15 – p. 99, ln. 20); ECF 48-13, PageID 1077 (Drabczyk Dep. Trans, p. 79, lns. 5-21); *See also¸* ECF 48-6.

[54] ECF 48-8, PageID 1021-1022 (Dep. Trans. DF Roberson, p. 88, ln. 19 – p. 89, ln. 3).

[55] ECF 48-12, PageID 1058 (Dep. Trans. DF. Topp, Vol 1, p. 102, ln. 20-24).

[56] For further analysis of ineffective supervision and monitoring, *see* Plaintiff's Response to Individual Defendant's Motion of Summary Judgment, ECF forthcoming.

[57] Exhibit B, Screenshot, Surveillance Video, December 22, 2012, 3:21 p.m.

[58] Dr. Peters testified McKinley could have easily been decontaminated in the restraint chair by either a bucket of water or decontamination spray, among other options. ECF 48-3, PageID 912 (dep. p. 127, lns. 7-25).

for Summary Judgment[59]), he may still be alive. Psychologically scared perhaps, but alive because the pepper-spray would have been deactivated and the hood removed from his head.

### C. Defendant Muskegon County is liable under Section 1983 for its failure to provide adequate training in light of predictable and foreseeable consequences that could result from a lack of training

The employing agency is responsible and obligated to direct the training and competency of its deputies. Muskegon County failed to adequately train its deputies in the specific areas of restraint chairs and spit hoods, and the combined use of those devices with pepper-spray in light of foreseeable and highly predictable consequences. As demonstrated below, Plaintiff has identified deficiencies in the training program as a whole.

Defendant relies on *City of Canton v. Harris*[60] in the failure-to-train context to attach municipal liability under section 1983. The *Canton* Court unanimously rejected the argument that municipal liability can be imposed only where the challenged policy is itself unconstitutional and concluded "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under §1983."[61] "The inadequacy of training policy may serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."[62] The Court observed:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury. [footnotes omitted][63]

---

[59] ECF 45-1, PageID 214 (p. 17, FN3).
[60] *City of Canton v. Harris*, 489 U.S. 378 (1989)
[61] *Id.* at 387.
[62] *Id.* at 388.
[63] *Id*. at 390.

The "deliberate indifference" standard has nothing to do with the level of culpability that may be required to make out the underlying constitutional wrong, but rather has to do with what is required to establish the municipal policy as the "moving force" behind the constitutional violation.[64]

*Canton* provides a plaintiff with two different approaches to a failure-to-train case. First, a plaintiff may establish deliberate indifference by demonstrating a failure-to-train in a specific area where there is an obvious need for training to avoid violations of citizens' constitutional rights. Second, plaintiff may rely on a pattern of unconstitutional conduct so pervasive as to imply actual or constructive knowledge on the part of policymakers, whose deliberate indifference, evidenced by a failure to correct once the need for training became obvious, would be attributable to the municipality.[65]

In *Thomas v. Cumberland County,*[66] the plaintiff advanced a single-incident theory of liability arguing that the defendant was deliberately indifferent to training relevant to inmate safety. The court found a jury could find the defendant was deliberately indifferent from a single-incident violation in that the risk of Thomas's injury was a highly predictable consequence of defendant's failure to provide de-escalation and intervention training as a part of pre-service training. Thomas provided expert opinion evidence that the failure to provide conflict de-escalation and intervention training was a careless and dangerous practice not aligned with prevailing standards. Thomas also offered evidence that fights regularly occurred in the prison. Importantly, the Court concluded while these fights were not sufficient to create a pattern of violations, they are relevant to whether Thomas's injury was a 'highly predictable consequence' of the failure to

---

[64] *Id.* at 388, n.8.
[65] *See generally*, *Canton v. Harris*, 489 U.S. 378 (1989).
[66] *Thomas v. Cumberland County,* 749 F.3d 217, 223, 225-27 (3rd Cir. 2014).

train on de-escalation techniques for single-incident liability. The Court held a reasonable jury could conclude based on the frequency of fights and the volatile nature of the prison that the predictability that an officer lacking de-escalation and intervention training will violate rights and the likelihood that the situation will recur demonstrate deliberate indifference on the County's part. The Court further reasoned, "given the frequency of fights occurring between inmates could lead to constitutional violations for failure to protect, *the lack of training is akin to 'a failure to equip law enforcement officers with specific tools to handle recurring situations*.'"[67]

Similar to the failures in *Thomas,* Muskegon County has also failed to adequately train its deputies on restraint chairs, spit hoods, and the combined use of these devices with pepper spray, despite the likelihood of a recurring event with predictable outcomes. This is especially true given the knowledge that its deputies used these types of restraints often.[68]

Dr. Peters, who is retained as an expert witness 70% of the time by defendants[69] and trains law enforcement personnel,[70] opined Defendant Muskegon County deliberately chose not to formally train and/or objectively test its deputies on how to properly use a restraint chair or spit hood, both of which were outside generally accepted career and technical education and correctional jail practices.[71] There is no evidence of training on the spit hood.[72] And since the spit hood is an expected piece of equipment, there should have been competency-based training to ensure the deputy is competent in the use of the device.[73] As explored in *Canton*, this is a glaring

---

[67] *Id*. at 225.
[68] ECF 48- 22, PageIDs, 1209-1210 (Herman Dep. Trans, pp. 66 – 67); ECF 48-13, PageID 1073, (Drabczyk Dep. Trans, p. 71, ln 3-6).
[69] ECF 48-3, PageID 890 (Peters dep. p. 38, lns. 11-22).
[70] *Id*. at PageID 882, (dep. p. 6, lns. 10-16)
[71] ECF 48-14, Preliminary Report, John Peters, Ph.D., August 5, 2015.
[72] ECF 48-3, PageID 901 (Peters dep. p. 86, lns. 17-25).
[73] *Id*. (Peters dep. p. 87, lns. 1-13).

omission in the training regimen creating a genuine issue of material fact that the municipality disregarded a known or obvious consequence of its action.

Defendant argues the focus must be on the adequacy of training itself, and not whether a particular officer was adequately trained.[74] This is precisely the point. The evidence shows there was no training program that adequately addressed the restraint devices, and combination of devices, that caused McKinley's death. Nonetheless, Defendant argues it "provides significant training to its corrections staff" and cites individual deputy testimony regarding training on various subjects.[75] Upon initial review of Defendant's bullet-point list, the natural reflex is to believe each deputy received training on spit hoods and restraint chairs. But a more circumspect examination of the "training" raises serious questions about the adequacy of the training and whether the "training" took place at all.

For example, Defendant offers deposition testimony and references training records in order to make general statements about satisfactory training on the use of the restraint chair and spit hood.[76] Taken in the order presented in Defendant's briefing, Plaintiff crystallizes the point that genuine issues of material fact exist with respect to training in critical areas:

> **Sergeant Jones-Burton:**  Despite Defendant's statement, Jones-Burton did not testify she received on-the-job training for use of the spit hood. In fact she testified she received no training at all with respect to the spit hood. She had also not received any specific training on the use of restraint chair: "Someone may have shown me how to  do it [put someone in the chair], but it wasn't' considered training." Furthermore, her training records do not reflect any training whatsoever with respect to restraint measures generally, pepper spray, restraint chairs, or spit hoods.[77]

---

[74] ECF 45-1, PageID 215, (p. 18).
[75] *Id.* at PageID 206, 207 (p. 9-10).
[76] *Id.*
[77] ECF 48-27, PageID 1242 (dep. p. 41, lns. 14-16, 20 – p. 42, ln. 9). *See also*, ECF 48-31, PageIDs 1337 – 1342.

**Deputy Topp:** During his first deposition, Topp testified he did not receive any training with regard to spit masks.[78] There was no written policy on restraint chair use, and he learned on-the-job on how to use it. "It wasn't a formal training by any means."[79] During his continued deposition where his counsel asked him questions he testified: Of the 10-20 times he had put someone in a restraint chair, he had had no on-the-job training on how to do it.[80] And he had no familiarity with the restraint chair before coming to Muskegon County Jail or at Michigan State or at the academy.[81] Additionally, Topp's training materials produced in discovery do not reflect any training for spit hood, restraint chairs, or O/C Spray (although he testified he was an instructor).

**Deputy Smith:** Smith received no training with respect to the restraint chair.[82] And while he vaguely recalled some type of training on spit masks, he did not remember when the training took place or what the training entailed, or what type of mask was used for the training.[83] The O/C Spray training he received was in 2001 and 2007.[84] He received no updated O/C training between 2007 and 2012.[85] His training records reflect an O/C "training" in 2010, but no training with respect to restraints, spit hoods, or restraint chairs from 2008 to 2012.

**Deputy Roberson:** The training Roberson retrieved on spit hoods was a "brief overview" of them coming out of the police academy and the corrections academy in the 1990s.[86] Since he was hired in the 1990s he never received any specific training, protocols, or procedures as to the use of spit masks.[87] Roberson further testified the on-the-job training on the restraint chair is generally a one-time occasion for new hires.[88] Roberson's training records indicate he had two one-hour training sessions regarding O/C spray in 2010 and 2011.[89]

**Deputy Herman:** While Defendant Herman testified he used a restraint chair many times, even in combination with a spit hood and pepper spray, he specifically testified he had not gotten any specific training.[90] He testified he never received any training on the spit hood

---

[78] ECF 48-12, PageID 1060 (dep. p. 107, lns. 18-20).

[79] *Id*. (dep. p. 107, ln. 25 – p. 108, ln. 8).

[80] Exhibit C, Excerpt, DF Topp Dep. Trans., Vol II, p. 6, ln. 15 – p. 7, ln. 2.

[81] *Id*. at p. 5, lns. 14-21.

[82] Exhibit D, Excerpt, DF Smith Dep. Trans, Vol I, p. 117, lns. 20-25.

[83] *Id*. at p. 116, ln. 23 – p. 117, ln. 19.

[84] *Id*. at p. 121, ln. 12 – 23.

[85] *Id.*

[86] ECF 48-8, PageID 1024-1025 (dep. p. 140, ln. 17 – 141, ln. 4).

[87] *Id*. at PageID 1025, (dep. p. 141, lns. 9-15).

[88] Exhibit E, Excerpt, DF Roberson Dep. Trans., p. 142, ln. 16, p. 143, ln. 4.

[89] ECF 48-32, PageID 1370

[90] Exhibit F, Excerpt, DF Herman Dep. Trans., p. 77, lns. 22 – 24.

because in his opinion it posed no danger.[91] Herman's training records are void of O/C spray training.[92]

**Deputy Drabczyk:** Defendant Drabczyk's highly questionable training record is more fully detailed below. In summation, there is no evidence of any specific training with respect to restraint chairs or spit hood.[93] For example, he has never been trained on how snug to fit the restraint straps with the restraint chair.[94] Drabczyk's training records are also void of O/C spray training.[95]

**Deputy Ahrens:** Defendant Ahrens did not receive any training with respect to the spit hood,[96] but received some sort of training on the restraint chair[97] apparently consistent with Roberson's testimony about new hires. Ahrens was hired in the 1990s.[98] Critically importantly, she had never been trained on the use of restraint chair, pepper spray, and spit hood used together.[99] Ahren's training records shows two one-hour O/C spray training in 2007, and 2011.[100]

**Deputy Theilbar:** Defendant Theilbar never received any written policies or procedures that provided guidance or training as to how to use a spit hood,[101] but allegedly received on-the-job instruction and witnessed others use it.[102] Again, he never received any specific training on the combined use of a spit hood, pepper spray and restraint chair.[103] Thielbar's training records show two one-hour O/C training session in 2007 and 2013.[104]

Virtually all deputies testified they received no formal training on the use of spit hoods or restraint chairs and there was no training on the combined use of spit hoods, pepper spray, and restraint chairs.[105] Compounding the predictable risk, pepper spray training for most deputies was

---

[91] *Id*. at p. 15, lns. 5- 14, p. 16, lns. 3- 5.
[92] ECF 48-31, PageID 1351-1359.
[93] Exhibit G, Excerpt, DF Drabczyk Dep. Trans, p. 75, lns. 23-25.
[94] ECF 48-13, PageID 1071 (dep. p. 66, lns. 10-20).
[95] ECF-48-31, PageID 1343-1350.
[96] ECF 48-28, PageID 1299 (dep. p. 15, lns. 11-15).
[97] *Id*. (dep. p. 15, lns. 20-25), Exhibit H, Excerpt, DF Ahrens Dep. Trans (dep. p. 16, lns. 1-2).
[98] ECF 48-28, PageID 1300 (dep. p. 17, lns. 10-22).
[99] *Id*. at PageID 1301, (dep. p. 20, lns. 5 – 13).
[100] ECF 48-31, PageID 1309 – 1317.
[101] ECF 48-26, PageID 1228, (dep. p. 11, lns. 11-16).
[102] *Id*. at PageID 1228 – 1229 (dep. p. 11, lns. 17 – p. 12, ln. 3).
[103] *Id*. at PageID 1229 (dep. p. 12, lns. 4-7).
[104] ECF 48-32, PageID 1361-1369.
[105] ECF 48-8, PageID 1024 (dep. p. 140, ln. 17 – p. 141, ln. 9, p. 182, lns. 15-20)(Defendant Roberson, between the 1990s when he finished the police academy and 2015, no training on the use of a spit hood/mask/veil by Defendant Muskegon County, no training regarding the use of OC

substantially dated, and not regularly supplemented.[106]Additionally, although Defendant Roberson testified he received an "overview" of how to use a spit mask and Defendant Theilbar indicated deputies showed him how to use the restraint chair, Dr. Peters drew a distinction between an "overview" and training explaining that training was more extensive and involved testing to ensure understanding.[107] Training for a spit hood/mask/veil is essential to gain competency in three areas: (1) to know what it is; (2) to know how to put it on properly; (3) and to know when and when not to put it on an inmate.[108] An overview and haphazard introduction to the spit hood is not training. Training involves a lesson plan; testing; some sort of documentation.[109] Training is not holding up a spit hood and saying "this is a spit hood." Training would include how to carry it, where to carry it, when to use it, how to use it, how to decontaminate it, what to do if a person has breathing problems.[110] Training ensures the spit hood is not pushed into the mouth; not applied to tightly;

---

spray and spit hood/mask/veil together); Rec. Doc 48-11, PageID 1052-1053 (dep. p. 114, ln. 7 – 115, ln. 19)(Defendant Smith, no written policy regarding use of spit/hood/mask/veil, no recollection of written policy on restraint on chair); ECF 48-12, PageID 1060 (dep. p. 107, lns. 6 – p. 108, ln. 8 (Defendant Topp no written policy or training on the use of a spit hood/mask/veil, no written policy or formal training on use of restraint chair); ECF 48-26, PageID 1228 (dep. p. 11, ln. 11 - p. 13, ln. 5 (Defendant Thielbar, no written policies or training on use of spit hood/mask/veil, no training on the combination of restraint chair and spit hood, no training on the combination of spit hood and pepper spray); ECF 48-27, PageID 1242 (dep. p. 41, ln. 3 – p. 42, ln. 9, p. 116, lns. 19-22)(Sgt. Jones-Burton was unaware of her deputies receiving training regarding the use of the spit hood, restraint chair, Sgt. Jones-Burton did not receive any training regarding use of the restraint chair or the combination of use of a spit hood and pepper spray); ECF 48-13, PageID 1071(dep. p. 66, lns. 21-25)(Defendant Drabczyk unaware of any written policy regarding use of restraint chair); ECF 48-28, PageID 1299-1301 (dep. p. 15, lns. 11-15, p. 17, lns. 10-13, p. 20, lns. 5-13)(Defendant Ahrens no written training regarding use of spit hood/mask/veil or restraint chair, no training regarding the combination of use of spit hood/mask/veil, restraint chair and pepper spray).

[106] *See,* ECF#s 48- 31, 48-32, Training Records of Defendants.
[107] ECF 48-3, PageID 903 (Dep. Trans. Expert Peters, p. 91, ln. 15 – p. 92, ln. 22).
[108] *Id.* at PageID 904 (p. 96, lns. 4 – 8, p. 117, ln. 23 – p. 119, ln. 13).
[109] *Id.*at PageID 903(dep. p. 91, lns. 4-7).
[110] *Id.* (dep. p. 91, lns. 8-15).

not cinched under the chin in a manner that may affect breathing.[111] There is no evidence whatsoever of this type of training at the Muskegon County Jail.

Defendant states there is no how-to manual for restraint chairs. This position is not only erroneous, but emphasizes the importance of specific training concerning how the straps are tightened and to what degree; if and how the chair should (or should not) be used in conjunction with a spit hood and pepper spray; and, the necessity for in-person observation/supervision and medical assessment. Though some deputies described "on-the-job" training, Dr. Peters indicated on-the-job training without testing and evaluation was ineffective.[112] When you have a device (e.g. spit hood and restraint chair) that requires competency, there must be objective testing for that competency.[113]

Using O/C Spray combined with a spit hood can have dire consequences. There has been occasion when the wrong mask was put on someone and they suffocated.[114] Dr. Peters has trained correction officers for many years, including in the State of Michigan beginning in 1983.[115] He has trained thousands of instructors on the use of O/C Spray and Foam.[116] Proper training would have instructed the deputies that you don't put a spit mask on somebody after they have been sprayed with O/C spray.[117] Any why is it inherently dangerous to use a spit hood after pepper spray and without decontamination? Dr. Peter's explains:

> Q.    Spit masks in general, what effect do they have on respiratory function, if you know?

---

[111] *Id.* at PageID 905 (dep. p. 99, lns. 8-18, p. 91, ln. 23 – p. 92, ln. 6)(Dr. Peters received training on how to put on a spit mask and how to position it so that people can breathe).
[112] *Id.*
[113] *Id.* at PageID 904 (dep. p. 95, ln. 22 – p. 96, ln. 3).
[114] *Id.* (dep. p. 96, lns. 9-21).
[115] *Id.* at PageID 892 (dep. p. 47, lns. 11-13, p. 14, lns. 1-9).
[116] *Id.* at PageID 898 (dep. p. 70, lns. 16-24).
[117] *Id.* at PageID 903 (dep. p. 92, lns. 7-13).

A.   If they're put on incorrectly, and in some cases correctly, when somebody takes a facial hit of pepper spray, you have -- OC spray affects the mucous membranes, can cause the throat to swell.  It can cause the nostrils on the inside of the nasal passageways to swell.  It produces liquid coming out of the eyes, the nose, and usually mucus either in the throat or in the nose.

Depending on how this is applied, it can restrict that removal of those items, particularly where the person is handcuffed and can't help him or herself get those fluids out of the way.  So this could trap that.

It will trap the particles against the skin. It can keep the aerosolized nature within this area which can create constant heat, abrasion, and aggravation which can produce fear which can produce anxiety and ultimately inflate respiratory system.[118]

This is what happened to Mr. McKinley.  And this is why you need specific policies on these restraint devices, in addition to specific training and competency testing.

Defendants cites *Walker v. Norris*[119] in the failure to train context. In *Walker*, the Plaintiff alleged the guards did not receive proper training in opening prison doors. The court found the correction officers received three weeks of training upon hiring and forty hours per year of refresher training. There is no such evidence in this case of training as regularly as *Walker* or even remotely relevant to the restraint measures used. Muskegon County had a general indifference to training. By a deputy's own admission, there did not appear to be any rhyme or reason to the training at the Muskegon County Jail.[120]

The deficiencies of the overall training program with the Muskegon County Jail are underscored by Defendant Drabcyzk's testimony about his actual training record. Before his deposition, Defendant Drabczyk had never seen the Officer Query Report (OQR) that purportedly reflected his training record.[121] As his testimony unfolds, he unceremoniously denies actually

---

[118] *Id.* at PageID 905-906 (dep. p. 97, ln. 17 – p. 98, ln. 11; p. 101, ln. 6 – p. 102, ln. 9).
[119] *Walker v. Norris*, 917 F.2d 1449 (6th Cir. 1990).
[120] Exhibit G, Excerpt, DF Drabczyk, Dep. Trans, p. 99, lns. 16-24.
[121] *Id.* at p. 93, lns. 1-4.

attending the training listed in his file. With respect to the OQR, Drabczyk testified although the document indicates the training category and completion date, he did not remember attending the training at all.[122] He even indicated that some of the "training" identified was not training, but information about new jails.[123] Of the eleven or so entries he remembered attending the December 18, 2012 mental health category and excited delirium.[124]

More alarming, Drabczyk did not recall attending various training from 2008 – 2013 that was documented in his personnel file.

Q      Okay.  These training dates in 2008, do you remember attending any of these training seminars in 2008?

**A      No, I do not.**

Q      When you attend training, do you have to sign in?  Is there a sign-in sheet, or how do people know --

A      Typically, any training I've ever gone to, whether it's in-house or at a different location, there's a training sheet you have to sign.

Q      The March 17, 2008, training date of sudden death in custody, do you remember that training at all?

**A      No, I do not.**

Q      Turn to the next page.  2009 training, it looks like.  Do you remember attending any of these training seminars listed on this fourth page?

**A      No, I do not.**

Q      Okay.  I don't see any OC spray training in 2009 on this fourth page, do you?

**A      No, sir.**

Q      Okay.  Just go back for a minute.  2008, there's no OC spray training on that list, is there?

**A      No, sir.**

****

Q      Turning to the next page, it looks like training for 2010. Do you remember specifically attending any of these training -- any of these training seminars or modules?

**A      No, sir.**

****

Q      Let's move on to the next page, which is 2012.  Do you recall attending any of the training listed on this page?

---

[122] *Id*. at p. 94, lns. 8- 17.
[123] *See Id*. at lns. 20 – 24 (Drabczyk describing entries regarding new jails and building a new facility, but nothing related to training on that particular page of his training record).
[124] *Id*. at p. 95, lns. 10-13.

> **A**    No, I do not.
>
> **Q**    Okay.  And the last page is 2013.  There's one entry of January 14, 2013, CPR/AED/1st Aide as a training topic.  Do you remember attending that training?
>
> **A**    **No, I do not.**[125]

There are no records whatsoever to support even rudimentary training on the critical areas of restraints chairs and spit hoods. It appears from individual deputy personnel files, some pepper spray training was received. But… the training was dated and inadequate. If one believes the veracity of the training records in light of Defendant Drabcyzk's testimony above, at a minimum, most deputies received O/C training years ago, with no recent refresher courses. All deputies were deposed duces tecum. Each deputy was asked to bring any additional training records they may have in their possession beyond what was already produced during discovery.[126] All deputies came empty handed.

Finally, Defendants' recurring theme is that McKinley on December 22, 2012 was the worst situation they had ever encountered and that he had superhuman strength (which is debatable and contradicted by testimony of some deputies). If true, this fact further supports the necessity of adequate training on restraint devices and procedures. In *Allen v. Muskogee*,[127] the Court reasoned the likelihood officers will frequently have to deal with armed emotionally upset persons, and the predictability that officers trained to leave cover, approach, and attempt to disarm such persons will provoke a violent response, could justify a finding that the City's failure to properly train its

---

[125] *Id.* at p. 97, ln. 5 – p. 100, ln. 6 (emphasis added).

[126] For example, Defendants Topp and Smith were asked to bring any other training records they may have concerning the spit hood, pepper spray, etc. Nothing was produced. Exhibit C, Excerpt, DF Topp, Dep. Trans., p. 78, ln. 19 – p. 79, ln. 16; Exhibit D, Excerpt, DF Smith, Dep Trans., Vol. I, pp. 119, 120.

[127] *Allen v. Muskogee*, 119 F.3d 837, 845 (10th Cir. 1997)(This case concerned the issue of whether a single violation of federal rights may be a highly predictable consequence of failure to train officers to handle recurring situations with an obvious potential for such a violation).

officers reflected deliberate indifference to the obvious consequence of the City's choice. "The likelihood of a violent response to this type of police action also may support an inference of causation − that the City's indifference led directly to the very consequence that was so predictable."

McKinley was unarmed. But similar to the reasoning in *Allen,* the likelihood that deputies would have to deal with an emotionally upset pretrial detainee, and one who may become more upset and agitated after pepper sprayed, is highly predictable and foreseeable. Failure to adequately train its deputies on often used restraint devices is deliberate indifference. Muskegon County had a uniform policy of providing its deputies with insufficient training or no training at all in the areas closely related to McKinley's injuries and death, from which we reasonably infer that the deputies' training was insufficient.

## V.     RELIEF REQUESTED

For the reasons above, Plaintiff respectfully requests this Court **DENY** Defendant Muskegon County's Motion for Summary Judgment in its entirety.

Respectfully submitted,

Dated: January 4, 2016                              By: /s/ *Stephen R. Drew*

Stephen R. Drew (P24323)
Adam C. Sturdivant (P72285)
DREW, COOPER & ANDING
Attorneys for Plaintiff
80 Ottawa Avenue NW, Suite 200
Grand Rapids, Michigan 49503
Phone: (616) 454-8300

## INDEX OF EXHIBITS

**Exhibit**..............................................................................................................**Description**

Exhibit A ........................ *Tithof v. Reed,* 2015 U.S. Dist. LEXIS 45573 (E.D. Mich. Apr. 8, 2015)

Exhibit B .......................................................Screenshot, Surveillance Video, December 22, 2012

Exhibit C ...................................................... Excerpt, DF Topp Dep. Trans., Vol II, Oct. 22, 2015

Exhibit D...................................................Excerpt, DF Smith Dep Trans., Vol. I, July 23, 2015

Exhibit E .................................................Excerpt, DF Roberson Dep. Trans, June 22, 2015

Exhibit F.............................................................. Excerpt, DF Herman Dep. Trans, Nov. 4, 2015

Exhibit G......................................................Excerpt, DF Drabczyk Dep. Trans., Nov. 5, 2015

Exhibit H.............................................................Excerpt, DF Ahrens Dep. Trans., Nov. 4, 2015

Exhibit I ......................... Excerpt, Plaintiff's Request for Production of Documents, Feb. 6, 2015

## <u>CERTIFICATE OF SERVICE</u>

The foregoing document was filed electronically on the 4th day of January 2016 in accordance with the Court's ECF system. Notice of this filing will be sent to all parties by operation of the Court's ECF system.

Respectfully submitted,

Dated: January 4, 2016                    By:   /s/ Stephen R. Drew
                                                Stephen R. Drew (P24323)
                                                Adam C. Sturdivant (P72285)
                                                DREW, COOPER & ANDING
                                                Attorneys for Plaintiff
                                                80 Ottawa Avenue NW, Suite 200
                                                Grand Rapids, Michigan 49503
                                                Phone: (616) 454-8300
                                                E-mail: sdrew@dca-lawyers.com
                                                E-mail: asturdivant@dca-lawyers.com